SAMUEL J. PHELPS and LEAH PHELPS,

*Plaintiffs and Respondents,*

vs.

WOODWARD CONSTRUCTION COMPANY, a Wyoming Corporation,

*Defendant and Respondent,*

and

NORTHERN UTILITIES COMPANY, a Wyoming Corporation,

*Defendant and Appellant.*

SAMUEL J. PHELPS and LEAH PHELPS,

*Plaintiffs and Appellants,*

vs.

WOODWARD CONSTRUCTION COMPANY, a Wyoming Corporation, and NORTHERN UTILITIES COMPANY, a Wyoming Corporation,

*Defendants and Respondents.*

Nos. 2395 and 2396, March 22nd, 1949 204 Pac. (2) 179.)

34

36

For the Plaintiffs, Respondents in Case No. 2395 and Appellants in Case No. 2396, the causes were submitted upon the brief of W. A. Muir and Glenn G. Stanton, both of Rock Springs, Wyoming, and oral argument by Mr. Stanton.

For the Defendant Woodward Construction Company, Respondent in both cases, the causes were submitted upon the brief and also oral argument of Albert E. Nelson of Rock Springs, Wyoming.

For the Defendant Northern Utilities Company, Appellant in Case No. 2395 and Respondent in Case No. 2396, the causes were submitted upon the brief of Edward E. Murane and Fred W. Layman, both of Casper, Wyoming, and oral argument of Mr. Murane.

38

40

## OPINION

BLUME, Justice.

This action was brought by the plaintiffs, Samuel J. Phelps and Leah Phelps, against the defendants for damages in the sum of $10,500 on account of the wrongful destruction of their home in Rock Springs, Wyoming, by gas explosion. The court found in favor of the plaintiffs and against the Northern Utilities Company and rendered judgment against the latter for the sum of $8,395 and costs. That company has appealed to this court, assigning as error that the judgment is contrary to law and contrary to the evidence and not sustained by the evidence. The court found in favor of the Woodward Construction Company. The plaintiffs in the case have taken a cross appeal in this case, assigning as error the finding in favor of the Woodward Construction Company, and that the judgment against the Northern Utilities Company should have been for the amount asked for in the amended petition instead of for the sum of $8,395. The Northern Utilities Company will hereafter be referred to by name or as the gas company, and the Woodward Construction Company will be referred to by name or as the construction company. Plaintiffs did not press the cross appeal against the Woodward Construction Company, and their counsel stated in open court that they would be satisfied with the judgment against the Northern Utilities Company. We shall, accordingly, disregard the pleadings in the case so far as the construction company is concerned and not investigate the evidence relating to that company except insofar as it elucidates the case against the gas company.

A summary of the facts is as follows: The Northern Utilities Company is the holder by assignment of a franchise granted by ordinance by the City of Rock Springs to lay pipes and conduits within the city limits

and supply consumers with gas for heating and cooking purposes. It was such assignee during all the times herein mentioned. Section 2 of the ordinance granting the franchise provides as follows:

"(a)   All pipes and conduits shall be laid in the ground at a depth of not less than thirty inches under the surface in a straight line, all mains shall be laid at such locations as shall be designated by the City of Rock Springs and in all instances in such ways as not to annoy or interfere with property holders and residents of said City of Rock Springs in the enjoyment of their property and conduct of their business, and, when it is possible, all pipes and conduits shall be laid in the alleyways rather than in the streets.

"(e)   All main and branch lines and conduits shall be constructed, laid, managed and operated in such ways as to protect property and the public as far as may be from damage and danger and not to interfere with or endanger private property or the conduct of business.

"(f)   All branch and supply pipes, conduits, equipments and other necessary appliances for the purpose of supplying natural gas from grantee's, his successors and assigns, main or branch supply conduit to buildings and premises in said City shall be done in accordance with the best and usual practices in such business and the rules of the National Board of Fire Underwriters and the Inspector of light, heat and power appliances and the tapping of the main therefore shall be done and furnished by said grantee, his successors and assigns, to the property owner or user of gas upon any premises at a cost to the property owner or gas user not to exceed the charges usually made for such work in other cities or towns in the State of Wyoming." The plaintiffs in this case caused the Superior Lumber Company of Rock Springs to erect a building for them on Lot No. 7 in Block numbered 6 in the Hospital Addition to the Town of Rock Springs during the year 1941, and moved into it in February, 1942. The lot is 50 feet wide and 100 feet deep, sloping downward from the alley in the back of the lot. The Northern Utilities

Company, at the request of the lumber company, about November or December, 1941, installed the service pipe in the house of plaintiffs running from the main in the alley straight across the back part of the lot to the house, a distance of approximately 53 feet. Neither the lumber company nor the plaintiffs knew of the depth at which the service line was laid until June 1, 1945, when the house was destroyed by an explosion. Mr. J. O. Johnston, an employee of the appellant, testified that he assisted in laying the service line on the premises of plaintiffs in the fall of 1941, and that it was laid at a depth of 18 to 24 inches and that the surface of the lot of plaintiffs had been changed since that time. Plaintiff Samuel J. Phelps testified as follows:

"Q. You may state whether or not there has been any change in the surface or contour of that land between the alley and your house from the time you moved in and the 1st of June, 1945? A. That surface has not been, that I know of. Q. You may state whether or not between the time you moved into your home and the 1st of June, 1945, whether or not there was any surface dirt taken out of your back yard between the rear of your house and the shut-off plug on the gas line other than what was removed on June 1st, 1945. A. No, sir. Q. Did you visit this back yard prior to the time you moved in, or were you at the premises or the house? A. Yes, sir. I was there several times. Q. Did you see the terrain of your back yard? A. Yes, sir. Q. You may state whether or not there was any dirt removed from the surface of your back yard between the time of the installation of the service gas line and the time you moved into your home. A. There was no dirt removed from the time we started building until I had them working up there on June 1, 1945. Q. Did you have any occasion to make any excavations there? A. No, sir. Q. Did you detect any erosion on the surface? A. No, sir."

Plaintiffs desired to grade the back part of their lot, and Samuel J. Phelps, one of the plaintiffs herein, requested the Woodward Construction Company to do

the grading. The contract in that connection was made with Mr. Robertson, General Manager of the construction company. George Kasper, foreman of that company, and Samuel J. Phelps went to the house of plaintiffs about 10 o'clock on the morning of June 1, 1945. The location of the service line on the lot was shown to Kasper, who shortly thereafter called one E. J. Kincaid, the operator of the grader used in the work, to go to the lot to commence the grading, and the operator in turn was shown the location of the service line on the lot. Approximately at 12 o'clock noon on June 1, 1945, Kincaid, in the operation of the grader, struck the service line about 18 to 19 feet back of the house toward the alley and found the service pipe to be at the depth of five to seven inches from the surface and put a kink or dent in the line, part of it with a sharp angle, which, as subsequently found, severed the service line inside of the house at a point where the line was joined to a pipe inside of the house in the form of an elbow. Phelps went home for lunch at noon, but did not then know that the service line had been struck nor, so far as the record shows, did he or his wife notice any gas in the house at that time. The kink put in the pipe by Kincaid was not observable without removing some of the dirt that covered it. Phelps a short time before one o'clock of that day, dug a hole to find the depth of the service line. He dug that approximately nine or ten feet from the house toward the alley and found the depth to be approximately five to six inches. About one o'clock, he left his house with his wife and child, taking them to some of his relatives, locked his house and expected to return soon in order to show Kincaid more in detail the work that he wanted done in the grading. He did not however return until approximately two o'clock when Kincaid told him that he had already struck the service pipe. The two examined it, lighting a match, saw that no gas was escaping, and

concluded that the kink in the pipe was without danger. Phelps, without going into his house, expected to inform the gas company at once, but was delayed and did not do so until approximately 2:30 in the afternoon. He then called up Mr. Hafey, the local manager of the Northern Utilities Company, who made a note and laid it on his desk for his workmen to go and examine the situation. They however did not arrive at the premises of plaintiffs until after the explosion of the house which took place about three o'clock in the afternoon and which demolished the home of the plaintiffs. By measurements apparently subsequently made, the service line on plaintiff's premises close to the alley was approximately 23 inches in depth; it was approximately 13 inches in depth at the house. Paul S. Nice, a chemical engineer, testified that to lay a gas pipe at the depth at which it was found where the service line was struck was dangerous. Ben H. Robertson, General Manager of the Woodward Construction Company, testified to a similar effect. There is testimony in the record that a difference is recognized between main gas lines, or pipes, and service gas lines, or pipes, meaning by the former the gas pipes laid in streets and alleys, and meaning by the latter the gas pipes laid on the premises of individual consumers of gas. Mr. Hafey, Mr. Johnston, and others on behalf of the Northern Utilities Company testified that the customary depth at which service lines were laid in Rock Springs and Green River and in Evanston was from 18 to 24 inches. The witness Nice testified that five per cent of gas in the house becomes explosive, and that the explosion in the instant case might have been caused by a spark furnished by an electric refrigerator in the house or by a spark from the lighting fixtures. More details on some of the points involved herein will be mentioned hereafter.

Plaintiffs, in their amended petition, alleged as negligence the fact that the Northern Utilities Company did not immediately, after being notified of the striking of the service pipe, go to the scene of danger and the fact that it failed to warn plaintiff Samuel J. Phelps at that time of the danger involved. It is not necessary and we shall not consider these allegations of negligence. Plaintiffs further alleged, in Paragraph 9 of their amended petition, after setting forth the ordinance for the franchise hereinabove mentioned, the following:

"9. That said defendant, Northern Utilities Company, a short time prior to February 22, 1942, in order to sell and furnish natural gas to said plaintiffs, laid and installed a gas pipeline in and upon the premises of said plaintiffs, hereinabove described, and that, in so doing, said defendant, Northern Utilities Company, negligently and carelessly, and in violation of the provisions of said Franchise, granted to it by the City of Rock Springs, as aforesaid, and particularly in violation of Sections 2-a, 2-e and 2-f thereof, failed and neglected to bury, inter and install said gas pipeline in a proper, safe and reasonable manner, and at a proper, safe and reasonable depth, as required by said Franchise, to-wit: A depth of not less than thirty inches, and did unlawfully, negligently and carelessly allow and permit said gas pipeline to remain interred and buried at a depth of less than thirty (30) inches at all times herein mentioned, and up to and including the time said gas pipeline was negligently and carelessly hit, struck and damaged, as is hereinafter alleged."

They further alleged in Paragraph 12 that the service pipe:

"had been unlawfully, negligently and carelessly laid, interred and installed by the said defendant, Northern Utilities Company, its agents, servants and employees, as herein alleged; that said defendants, and each of them, and their respective agents, servants and employees, at said time and place, and at the time and

place of said gas explosion, and prior thereto, failed and neglected to use proper care and precaution, or any care or precaution whatsoever, in laying, interring, installing or repairing said gas pipeline."

## I.   Negligence of the Northern Utilities Company.

Plaintiffs charged that the pipe should have been laid a depth of 30 inches. Counsel for the gas company contend that no such requirement was made by Section 2 (a) of the ordinance above set out. They insist that the requirement of that provision applies only to the main gas lines laid in streets and alleys. However, the first sentence of Section 2(a) provides: "All pipes and conduits shall be laid in the ground at a depth of not less than 30 inches under the surface in a straight line." That is all-inclusive and it makes no exceptions. Counsel for the gas company rely upon the last clause of Section 2(a), providing that: "all pipes and conduits should be laid in the alley-ways rather than in the streets", but that appears to refer only to the preference that should be given in laying gas pipes in streets and alleys, and that preference should be given to laying them in alleys rather than in streets. The doubt, if any, that exists on this point arises by reason of the testimony that a distinction is recognized between main gas lines and service lines, and that it is a general custom to lay the latter at a depth of 18 to 24 inches. So, we shall consider this case, in the main, from that standpoint and disregard, for the purposes of this case, the possibly further question as to whether or not plaintiffs should have had knowledge of that custom. And, we must first consider the matter of pleadings.

Counsel for the gas company contend that the only charge of negligence now under consideration in the amended petition is that the pipe was not laid at a depth of 30 inches. We think, however, that they give

too narrow a construction to the pleadings herein. Section 2(e) of the ordinance provides that all main and branch lines and conduits should be laid so as to protect private as well as public property. We think that includes the depth at which the pipes should be laid. Counsel contend that this clause makes no reference whatever to supply pipes to the premises of individuals. In other words, they construe the term branch lines as not referring to such lines. However, Section 2(f) refers to main or *branch supply conduits*, and taking the provisions as a whole, we think that when branch lines were mentioned, that seems to include the lines to supply residences of the city with gas. Section 2(e) appears to state merely a common law duty. 38 C. J. S. 732, 28 C. J. 592. The amended petition alleges in Paragraph 9 that the gas company "negligently and carelessly and in violation of the provisions of said Franchise granted to it by the City of Rock Springs as aforesaid, and, particularly in violation of Sections * * * 2(e), * * * failed and neglected to bury, inter and install such gas pipeline in a proper safe and reasonable manner and at a proper, safe and reasonable depth as required by said Franchise." It is true that it is added: "to-wit: A depth of not less than 30 inches," but that appears merely as a legal conclusion insofar as Section 2(e) is concerned. Furthermore, we must not overlook the allegations in Paragraph 12 already heretofore set out. In view of all these various allegations and giving the petition a liberal construction, as we must, we think that the plaintiffs sufficiently charged the gas company with failure of the common law duty of laying the pipes in question at a proper and lawful depth.

The evidence in this case shows that while the pipe close to the alley was laid at a depth of 23 inches, a large part of the pipe, in any event, was found on June 1, 1945 to be interred at the depth of only five to seven

inches. It is true that J. O. Johnston testifiied that when it was originally laid, it was laid at the depth of 18 to 24 inches. But that is entirely contradicted by the testimony of the plaintiff Samuel J. Phelps hereinbefore fully set out, so that the point as to what depth it was originally laid became a question of fact for the trial court to resolve, and we see no reason to disturb its finding in favor of the plaintiffs. The evidence further shows that the gas line as laid at the depth heretofore mentioned is unsafe and dangerous. In fact, the testimony adduced by the gas company itself shows that the customary depth at which the service line should be laid is 18 to 24 inches, so that the negligence of the gas company appears to be shown by the testimony of its own witnesses. Its counsel twice mention that the lot was uneven. They fail however to point out the importance of that. An owner of a lot in a town or city which he finds to be uneven naturally wants to grade and level it off. That would be true in nearly all instances, and the gas company should have anticipated that fact, and the fact that, if the gas line were laid at too shallow a depth, it might be hit and d a m a g e d. Counsel further have pointed out that Phelps expected to have part of the lot graded to the depth of three or four feet extending across and over the place where the pipe was laid. In view of that desire of the plaintiffs, it would of course have been possible that even though the gas company had laid the service pipe at a proper depth, it might have been struck anyway. But, that mere possibility cannot, we think, relieve the gas company of the liability for the negligence actually found to exist, or destroy the causal connection thereof with the damages resulting therefrom. The nature of the negligence of plaintiff, if any, was that of nonfeasance rather than misfeasance. And, it is said in Harper's Law of Torts, page 255, as follows: "But a mere possibility that the harm might have hap-

pened even if the defendant had not been guilty of his nonfeasance *is not sufficient to sever the causal connection between his culpable failure to act and the consequences. It must be a practical certainty that such consequences would have ensued anyway.*"

In the case of Davis vs. Garrett, 6 Bing. 716, 130 Eng. Rep. 1456, 1459, it is said:

"No wrong-doer can be allowed to apportion or qualify his own wrong; and that as a loss has actually happened whilst his wrongful act was in operation and force, and which is attributable to his wrongful act, he cannot set up as an answer to the action the bare possibility of a loss, if his wrongful act had never been done. It might admit of a different construction if he could show, not only that the same loss might have happened, but that it must have happened if the act complained of had not been done."

In the case of Reynolds vs. Railway Company, 37 La. Ann. R. 694, 698, it is said:

"But where the negligence of the defendant greatly multiplies the chances of accident to the plaintiff, and is of a character naturally leading to its occurrence, the mere possibility that it might have happened without the negligence is not sufficient to break the chain of cause and effect between the negligence and the injury. Courts, in such matters, consider the natural and ordinary course of events, and do not indulge in fanciful suppositions."

See also 2 Restatement of the Law of Torts, Section 432, comment c, page 1163; Beale in 33 Harvard Law Review 638. We think, accordingly, that the trial court was justified in finding that the gas company was negligent in the respect herein mentioned, and that there was a causal connection between such negligence and the subsequent explosion. As to whether or not a subsequently intervening factor relieved that company of responsibility herein will be discussed hereafter.

## II. Kincaid as agent of plaintiffs.

It is contended by the defendants, Northern Utilities Company, that E. J. Kincaid, the operator of the grader, was an agent of the plaintiffs in grading the lot for the latter and that his negligence is imputable to them. The testimony as to whether or not he was such agent of the plaintiffs is substantially as follows, giving, as we must, the testimony most favorable to the plaintiffs. Samuel J. Phelps, one of the plaintiffs in the case, testified that he had talked several times with Mr. Robertson, General Manager of the Woodward Construction Company, arranging for the leveling of his lot and Mr. Robertson agreed to send up his equipment. He did not hire the equipment. Phelps testified, "I just asked him if he could do the work. I did not at any time employ any of the employees of the WoodwardConstruction Company to do the work. There was no contract with the construction company regarding a bailment for hire. I made no contract that I would supervise or pay or boss the tractor or grader driver." Mr. Robertson, on June 1, 1945, sent Mr. Kasper to tell Mr. Phelps that the construction company was ready to do the work. They went to the lot of plaintiffs and he showed Mr. Kasper generally what he wanted done in grading the lot, showing him where the service line was located and telling him that care would have to be taken not to strike it. Phelps and Kasper went to the lot about ten o'clock and plaintiff told Mr. Kasper that he would be back later and show the operator of the grader just what had to be done. The operator was paid by the Woodward Construction Company. He, the operator, arrived at the lot with the grader sometime in the forenoon, having been shown generally by Mr. Kasper as to what had to be done and that care should be taken in not striking the service line which was shown to the operator, Mr. Kincaid. Mr. Phelps did not see the operator of the grader until approximately two o'clock

in the afternoon when he was told that the service line had already been struck, and he then gave him further instructions as to what should be done in grading the lot. Payment for the work to the construction company was to be made at so much per hour that it would take to complete the job as a whole.

We do not think that the trial court was compelled, under this evidence, to find that the operator of the grader, Mr. Kincaid, was the agent or employee of the plaintiffs while engaged in grading. Counsel for the gas company rely, among other authorities, upon Stockwell vs. Morris, 46 Wyo. 1, 22 Pac. 2d 189. That case involved the question as to whether the party in that case was an independent contractor or an employee. It did not involve the question as to whether or not an employee of one party, in doing work for a second party, is an employee or servant of the latter. In grading a small area like that involved in the case at bar, approximately 53 by 50 feet, some instructions and in some detail must be given by the owner who desires to have his lot graded. If the theory of counsel for the utilities company were correct, it would be impossible for an owner of such a small area to have his lot graded without becoming in every case responsible for the negligence of the operator of the grader. We think that the rule of control or right of control mentioned in the case of Stockwell vs. Morris, Supra, hardly goes that far and must be confined within reasonable limits. We are inclined to believe that counsel for the plaintiffs are correct when they say that: "Mr. Phelps' position in this case is similar to the position of a housewife who has entered into a contract to have her house painted and papered." The rule applicable in this case appears to be that stated in 57 C. J. S. 287-288, where it is said:

"A servant of one employer does not become the servant of another for whom the work is performed merely

because the latter points out to the servant the work to be done, or supervises the performance thereof, or designates the place and time for such performance, or gives signals calling him into activity, *or gives him directions as to the details of the work and manner of doing it,* or because the servants of the person for whom the work is being performed assist in the work."

(Italics supplied.)

The text is supported by numerous cases, particularly that part italicized above. For a rather exhaustive discussion of the rule, see the case of Landis vs. McGowan, 114 Colo. 355, 165 Pac. 2d 180. In 57 C. J. S. 289, it is further said: "The fact that an employee is using the general employer's machine or appliance has been held to indicate a continuation of the general employment, particularly if the machine or appliance is of considerable value." In Carlson vs. Sun-Maid Raisin Growers' Ass'n., 121 Cal. App. 719, 9 Pac. 2d 546, the court, citing several authorities, states as follows:

"The power of control does not exist in a situation where the special employer has no voice in the selection or retention of the negligent employee, * * * 'it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary cooperation where the work furnished is part of a larger operation.' "

In the case at bar, Mr. Kincaid was not known to Phelps. The latter did not choose him to perform the work. The Woodward Construction Company might have substituted a different person at any minute and in fact Phelps did not see him until two o'clock of the afternoon of June 1, 1945. Full control over him was of course in the Woodward Construction Company until that time and the service line had been struck by the time that Phelps met Kincaid.

III.   Negligence of Woodward Construction Company.

It is contended by counsel for the Northern Utilities Company that if Kincaid was not the agent of the plaintiff, then he was the agent of the Woodward Construction Company; that Kincaid was negligent, and that therefore the Woodward Construction Company should be the party held liable in damages herein instead of their client, and that the negligence should be held to be the proximate cause of the damages herein. Counsel base their argument of the negligence of Kincaid on the fact that he struck the pipe line, although he had been warned where the service line was located and to be careful on that account.   We do not however think that the mere fact that Kincaid knew the general location of the pipe makes the Woodward Construction Company necessarily liable.   There is no evidence that Kincaid knew of the depth of the service line.   He testified that he thought that it was at the depth of 20 to 30 inches.   He had a right to assume that the service line was laid at a lawful depth.   Richey & Gilbert Co. vs. Northwestern Natural Gas Corp., 16 Wash. 2d 631, 134 Pac. 2d 444, 449.

But let us assume for the purposes of argument that the construction company was negligent in some degree. It would not necessarily follow that the negligent conduct of the gas company was not at least one of the proximate or legal causes of the damages to plaintiffs herein.   The Restatement of the Law of Torts makes a legal cause of harm depend upon whether or not negligent conduct was a substantial factor in bringing about the harm.   If it was, then it is considered a legal cause thereof unless some rule of law relieves such negligent conduct from responsibility.   See Vol. 2, Restatement of the Law of Torts, Section 431.   The negligence of the construction company was not, we think, at least as a matter of law, an intervening event which

superseded the negligence of the gas company and relieved it of liability therefor. We have already pointed out that the latter company could reasonably anticipate—in fact, it should have known—that the lot of plaintiffs, uneven as it was, would be graded and leveled at some time, and care in laying the pipe should have been in proportion to that anticipation and knowledge. The negligence of Kincaid, if any, was directly connected with, and rose out of, and was a natural and continuous sequence of the negligence of the gas company. At least, the negligence of the former would not have been as likely to have intervened if the service line had been laid at the proper depth. When it was not so laid, the gas company should have anticipated that it might be hit and damaged. If the act of hitting the pipe in the manner in which it was hit had been an innocent accident, it could hardly be claimed that the original negligence of the gas company was superseded. On the other hand, if the act took place through negligence, the effect would have been no different and no reason accordingly could be given why the same legal rule should not apply to such a case. Stated otherwise, if the striking of the line by accident should have been anticipated, as we think it should, the fact that it was struck by negligence could not create a difference in the applicable legal rule. An accident might shade into negligence and vice versa. As stated in Prosser on Torts, 324:

"If the defendant's conduct was a substantial factor in causing the plaintiff's loss, it follows that he will not be absolved from responsibility merely because other causes, such as the negligence of other persons, have contributed to the result."

If the original wrongdoer "could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from

liability by reason of the intervening negligence of another." Shearman & Redfield on Negligence, Rev. Ed., Section 38. See also Vol. 2, Restatement of the Law of Torts, Sections 439 and 447; Harper on Torts, Section 123; Carpenter in 16 So. Cal. Law Review, 304-307. In view of the fact that it would at least have been less likely that the pipe would have been hit by Kincaid if it had been laid at the proper depth, we cannot say that the negligence of the gas company was not a substantial factor in causing the loss of the plaintiffs. It was not merely an innocent condition of which some of the authorities speak (45 C. J. 931), which was created by that company, but it created a condition or situation constantly fraught with a danger, which might instantly become active and result in damage whenever anyone undertook to level the lot. If the construction company was negligent, the rule applicable here would be that stated in 38 Am. Jur. 717-718 as follows:

"The rule is that when an injury occurs through the concurrent negligence of two persons, and it would not have happened in the absence of the negligence of either person, the negligence of each of the wrongdoers will be deemed a proximate cause of the injury, although they may have acted independently of one another, and both are answerable, jointly and severally, to the same extent as though the injury were caused by his negligence alone, without reference to which one was guilty of the last act of negligence. For example, if the presence of gas in a cellar is due to the negligence of the gas company, and an explosion results from the negligent striking of a match by a stranger, it is held that the party injured may recover against either the gas company or the stranger, or against both, at his election."

IV.   Contributory Negligence of Plaintiffs.

Counsel for the Northern Utilities Company contend that the plaintiff was guilty of contributory negligence

barring recovery herein. They argue that when Samuel J. Phelps discovered that the service line was buried only five, six or seven inches below the surface of the ground and when he knew at that time that the grader would have to take off three or four feet of the surface of the lot, he was definitely guilty of negligence in that he did not stay at the location until the grader operator returned to work after lunch, or to hunt up the operator and warn him of the situation he had discovered with reference to the shallow depth where the service line was buried. But Kincaid positively testified that he hit the gas line approximately at 12 o'clock of the day in question, so that for Phelps to have warned him at one o'clock would not of course have prevented hitting the pipe at 12 o'clock. Counsel for the gas company however think that Kincaid was mistaken and that he hit the gas line after one o'clock. They base their contention partly on the fact that the witness Nice testified that the house would be saturated with gas in a few minutes after the line was broken and that Phelps and his wife did not notice any gas in the house during the noon hour. It may be, however, that the pipe in the house at the elbow was not separated at once but only gradually. Or some other explanation may exist which is unascertainable at this time. It hardly seems probable that Kincaid could have been so mistaken as to the time at which he hit the pipe. But, even assuming that the pipe was actually hit after one o'clock, we are not persuaded that the argument of counsel is sound. They contend in substance that the plaintiff Phelps should have supervised the grading of the lot more than he did; that when he discovered that the gas company had been negligent in laying the gas pipe at an improper depth, he should at once have done all that he could to prevent any evil results that might arise out of negligence of the gas company. But, we do not think that under the

circumstances shown in this case that such was the duty of the plaintiff as a matter of law. It is doubtless true that: "If the danger is known and can be easily avoided, a peril voluntarily and unnecessarily assumed may constitute such contributory negligence as will preclude a recovery." 38 Am. Jur. 861-862. But, in this case, it is not shown that plaintiff Phelps actually knew the danger. When he warned Kasper to be careful not to strike the service line, and when he knew the shallow depth at which the service line had been laid, he did not necessarily, as counsel for the gas company argue, know the danger that might result from an explosion by reason of the kink in the gas line. This warning may have been given merely because he did not want his property damaged.

It is further argued that plaintiffs were guilty of contributory negligence because they failed to notify the defendant Northern Utilities Company immediately upon discovery of the damage to the service line and of the seriousness of the kink or dent therein, and failed to request an immediate investigation in time to prevent the explosion. Plaintiff Samuel J. Phelps, in that connection, testified as follows:

"I called Mr. Hafey on the telephone about two-thirty p.m., and told him what I was having done up to the house, and that the construction company had struck this pipe and put quite a kink in it, and also told him I had tested it out with a match, as I had seen the gas companies do, to see if it was leaking, and that it didn't show any sign of a leak on the outside; and I also told him, Mr. Hafey, that I didn't think there was any hurry, that it didn't show any apparent damage. Q. What was the purpose of calling Mr. Hafey at that time? A. Because of the kink in this pipe. I called him—I thought he should know it, but I didn't know of any damage at that time, outside of the kink in the pipe. Q. Did you go in the house at that time. A. No sir, I never went in. Q. And why didn't you? A. I had no reason to go in. I didn't think there was any

damage inside of the house. Q. Are you familiar with the elements and properties of natural gas? A. No, sir. Q. Have you ever worked around natural gas? or any other kind of volitant gas? A. No, sir. Q. Do you have any idea of the explosiveness of gas? A. No. sir."

Whether the plaintiff under the circumstances disclosed in this case should be held liable for contributory negligence as a matter of law depends on whether or not he appreciated or should have appreciated the danger that might follow the kink in the gas pipe, namely the explosion that actually occurred at three o'clock of June 1, 1945. That rule of law was discussed quite fully in the case of Loney vs. Laramie Auto Co., 36 Wyo. 339, 353, 354, 255 Pac. 350, where we said in part:

"Knowledge or imputed knowledge of danger that will bar recovery does not necessarily arise from mere knowledge of a defective condition by reason of which a man may be injured. Danger may lurk within every defective condition, and yet may not be of such character that men of ordinary prudence would hesitate to expose themselves thereto. The defect and the danger therefrom must be such that knowledge, or imputed knowledge thereof, would cause an ordinarily prudent person to appreciate the risk therefrom. * * * The issue of negligence or contributory negligence is ordinarily one to be determined by the jury. * * * That is true even in a case where the testimony, as in the case at bar, is undisputed, if different minds may fairly arrive at different conclusions, and where the inferences from the facts are not so certain that all reasonable men, in the exercise of fair and impartial judgment, must agree upon them."

So, it is said in 38 Am. Jur. 864:

"Care in avoiding injury implies that there is, or would be with all prudent persons, something to create a sense of danger. A plaintiff's knowledge of the physical characteristics of the offending instrumentality or condition does not, in itself, constitute contributory negli-

gence. A voluntary exposure to a known danger is an essential element of contributory negligence. Moreover, it is the appreciation of, or the opportunity to appreciate, the peril in an instrumentality or condition, rather than a knowledge of its physical characteristics, that bars a plaintiff of recovery for negligence. It does not follow necessarily, from proof that the plaintiff had knowledge, as of a physical fact, of the place or appliance by means of which he sustained the injury complained of, that he must have appreciated the danger to which he was exposed therefrom."

So, the question in the case at bar is whether Samuel J. Phelps appreciated the danger above mentioned or should have appreciated that danger. We think that this was a question of fact for the trial judge to solve and not a question of law. There is evidence in this case which indicates that to be true. E. J. Kincaid, the operator of the grader, testified that he struck the service pipe at 12 o'clock. Yet he said nothing about it until two o'clock. It is quite clear, it would seem, even if he struck the pipe after one o'clock, that he did not appreciate the danger resulting from the kink that was made in the pipe. We do not have the witness before us and we know nothing of the degree of his intelligence. We presume that he was a man of ordinary prudence and of ordinary intelligence, who would have appreciated the danger involved as readily as Phelps. The evidence in the case also indicates that even Mr. Hafey, the local manager of the Northern Utilities Company, did not appreciate, or at least fully appreciate, the danger attending the striking of the service pipe. It is not necessary to say that he was negligent in that connection. In fact, we should hesitate to say that he was, since he was lulled into security by Phelps. But, we are here speaking of his appreciation of the danger. If he had fully appreciated it, he would doubtless not alone have indicated that to Phelps when the latter phoned, but, in the absence of his men, would

personally have immediately hastened to the place of danger; nor would the absence of a key to the house have stopped him; a broken window would have served the purpose of getting the house open. If what we have said is true as to Mr. Hafey, it would surely be unreasonable to ask us to hold that Phelps was guilty, as a matter of law, of not appreciating the danger, particularly in view of the testimony recited above. See also in this connection Thompson vs. Cambridge Gas & Light Company, 201 Mass. 77, 87 N. E. 486.

V.  Amount of Judgment.

The court awarded the plaintiffs a judgment for $8395. Plaintiffs have taken a cross appeal because, as they claim, this amount is too small, and they now claim that the judgment should have been for $10,-042.50. The record does not disclose how the court arrived at the amount of the judgment. Under Section 3-3401 W. C. S. 1945, a new trial may be granted by the court on application in a case in which the amount of the recovery is claimed to be too small. Plaintiffs, however, did not ask for a new trial in the court below nor do they ask it here. They merely want this court to increase this amount. Counsel for the gas company have not argued the point at all. We do not know whether this is an oversight or is by reason of counsels' overconfidence that this court would reverse the judgment of the trial court. On the other hand, counsel for the plaintiffs have cited us to no case whatever on the subject, leaving this court unaided to solve the contention now before us. In Slane vs. Curtis, 41 Wyo. 402, 286 Pac. 372, 288 Pac. 12, 69 A. L. R. 906, we increased the amount awarded in the case on the second appeal in order to terminate the litigation and render a final judgment, fixing the minimum amount shown by the testimony to be due to the plaintiff. That case should not be considered an authority herein, since it is based,

in the main, on the special rule stated in 5 C. J. S. 1444, Section 1932, which in part is as follows: "The propriety of rendering or ordering final judgment on reversal is quite apparent where there have already been two or more trials of the cause and appellee has thus had ample opportunity to present all the evidence in his favor." In 3 Am. Jur. 688, it is said: "In actions for unliquidated damages, * * * the courts are generally inclined to the view that there is no right or power to increase the amount of the verdict." We take it that the damages in this case were unliquidated. See "unliquidated damages", 43 Words and Phrases 325. The subject of increasing the amount of an award made in the trial court is discussed in 5 C. J. S. 1373-1375. It appears that some of the courts, in any event, have increased the amount of the award in cases—speaking generally—where the record disclosed a definite and unquestionable basis for such increase. But the rule stated in 3 Am. Jur. 688, supra, has been applied by a number of courts. That is true for instance in Ohio, Kansas and Nebraska, which have codes of procedure similar to our own, and that has been true, we think, especially in cases presenting a situation similar to the situation in this case. It is stated in Gould vs. Gerken, 28 Ohio App. 309, 162 N. E. 701, 703: "We know of no authority which would authorize this court to increase the amount awarded in the court of common pleas, even if it found the trial court should have rendered a larger judgment. American Ry Express Co. vs. Bender, 20 Ohio App. 436, 152 N. E. 197." In Mercado vs. Nelson, 118 Kan. 302, 235 Pac. 123, 126, the court said: "This court has often directed that judgments be decreased or a new trial be granted, giving the party, against whom the order was made, the option of taking one or the other; but the court does not see how it can under the statutes of this state direct that the judgment be increased." In 64 C. J. 1099, it is stated: "As a gen-

eral rule where the determination of the amount of recovery is exclusively within the province of the jury the court has no power to amend the verdict by increasing the amount found by the jury." The supreme court of Nebraska, after quoting the foregoing text, stated in the case of Schnell vs. United Hail Ins. Co., 145 Neb. 768, 18 N. W. 2d 112, as follows: "By analogy of course this court has no power to do so upon appeal. Authorities relied upon by plaintiff are clearly distinguishable from the case at bar. It follows that this court cannot summarily correct the judgment or direct the trial court to do so." To that effect, too, is Anderson vs. Aetna Casualty & Surety Co., 175 S. C. 254, 178 S. E. 819. And the Montana court, in the case of Osterholm vs. Butte Electric Ry. Co., 60 Mont. 193, 199 Pac. 252, 255, stated that: "this court never has assumed to exercise the authority or power of 'scaling a verdict upward.' "

There may be a number of situations in which the rule stated in 3 Am. Jur. 688 is not applicable, but we think that it is in the case at bar, if for no other reason than that we have no sufficiently definite basis by which we could increase the amount awarded by the trial judge. The only testimony as to the value of the property was by the plaintiff Samuel J. Phelps, corroborated by the witness James. There was no contradictory testimony on the point on behalf of the defendant. But, it is stated in 32 C. J. S. 385-387 as follows: "The weight of opinion evidence as to value is for the jury, court, or other triers of the facts to determine in the light of their own experience and knowledge of like subjects, and the knowledge, experience, and capability of the witness to draw a sound conclusion. An opinion is not conclusive even though uncontradicted." Numerous cases sustain the text. In Thompson vs. Clausen (Iowa) 186 N. W. 20, a party by the name of Jones,

interested in the case, testified that the value of his interest in hotel property involved in that case was worth $4,500, but the court did not award him that amount. There was no contradictory evidence on that value, but the appellate court, refusing to increase the amount, stated:

"The trial court was not required to take the opinion of Jones as to the value of his property as a verity, even though undisputed. In connection with the opinion, the court, or a jury, may be guided by their own judgment in such matters. * * * If the rule were otherwise, and the court, or a jury, was bound by the undisputed evidence of a witness on value, Jones could have put the value of his equity at $100,000.

"The trial court saw and heard the witnesses, and had some advantage thereby. We are satisfied with the findings of the trial court."

In the case of Richey & Gilbert Co. vs. Northwestern Natural Gas Corp., 16 Wash 2d 631, 134 Pac. 2d 444, a jury awarded the verdict of $6,500. Plaintiff claimed that the undisputed testimony showed that he was entitled to a judgment for $20,000 and asked the appellate court to increase the award to that amount. The increase was denied. In Staudenmaier vs. Johnson, 117 Fed 2d 397, 398, the court stated: "there is no rule of law which requires a trial court to accept at its face value testimony of witnesses even though such testimony is neither formally contradicted nor impeached. The question of credibility of testimony is always present." In Mooney vs. Van Kleeck Mortgage Co., 79 Colo. 252, 245 Pac. 348, 349, the court stated:

"The evidence given as to the value of the inspector's time and of the value of the plaintiff's services was merely an expression of opinion or an estimate. It was wholly within the province of the trial court, sitting as a trier of the facts, to determine the weight and sufficiency of the evidence. The court was not bound by that evidence any more than a jury would have been

bound by it. The trial judge had the right to draw upon the knowledge he possessed, in common with the generality of mankind, to the same extent that a jury could and had the right to determine in considering the evidence and all the facts and circumstances surrounding the case, the amount of damage the plaintiff sustained. We cannot disturb the findings and judgment of the trial court."

We discussed the question of value to considerable extent in the case of Shikany vs. Salt Creek Trans. Co., 48 Wyo. 190, 45 Pac. 2d 645. In that case, the plaintiff testified to the value of a rug, giving the value at $2,500. The jury reduced it to $725, and we upheld the verdict. We said in that case: "Further, the jury had the testimony of the plaintiff that the rug was worth $2500. They discounted the testimony to a considerable extent, which they had the right to do, and they believed that the value was $725." In that case, we also cited the case of Dyer vs. Barnes, 128 Me. 131, 145 Atl. 741, in which the only testimony relating to the value of services in digging a well was fixed at $825. The jury returned a verdict for a lower amount and it was argued in that case, as in this, that the judgment should have been for the whole amount or none, but the court sustained the verdict of the jury. See, further, our discussion as to testimony of value in the case of Miracle vs. Barker, 59 Wyo. 92, 136 Pac. 2d 678.

Bearing the foregoing rule in mind, it may not be amiss to examine at random a few items of the evidence in this case on the point now under discussion. It was estimated that to rebuild the house would cost $8,010.60. The salvage was estimated at $1,115, making the loss $6,895.60. But, after all, this was but an estimate, which, under the foregoing rule, the court was not bound to accept as correct. The house had been painted in 1941. For aught the record shows it needed repainting in any event, so that perhaps the whole of this item

should have been excluded. Plaintiffs had a cabinet radio which, according to the testimony of Mr. Phelps, cost $240. No allowance for depreciation was made on this or any other item. Phelps testified that they had clothing in three different rooms of the total value of $658.80. No itemization of clothes is given nor is it shown what they cost or how old they were. No expensive item like, for instance, a fur coat, is shown to have been a part thereof, so that it cannot be surprising that the court considered this estimate too high. Mr. Phelps testified that he had groceries and fruits in the basement to the amount of $400. At that time, no one was supposed to have many groceries in his basement, so that it is difficult to see why the court should have accepted this item as being correct. In short, it is clear that this court cannot say that the trial court erred in reducing the amount at least as to some of the items. The result, of course, is that there is no sufficiently definite basis left by which we could increase the award made by the trial court, either in whole or in part.

The judgment of the trial court is accordingly affirmed on both appeals. Costs will be taxed as usual. except that no costs will be taxed for any briefs.