NATURAL GAS PROCESSING CO., a
Wyoming corporation, Appellant
(Defendant),

v.

Michael A. HULL, Appellee (Plaintiff).

No. 94–31.

Supreme Court of Wyoming.

Dec. 12, 1994.

Thomas A. Nicholas of Hirst & Applegate, Cheyenne, for appellant.

David B. Hooper, Hooper Law Offices, Riverton, for appellee.

Before GOLDEN, C.J., THOMAS, TAYLOR, JJ., and KALOKATHIS, and VOIGT, District Judges.

KALOKATHIS, District Judge.

This appeal follows a jury verdict finding Natural Gas Processing Company (NGP) ninety percent negligent in an oilfield accident that severely injured Michael Hull. The district court entered judgment based on the jury's verdict for $1,455,444, plus costs and interest. NGP contends four errors occurred mandating reversal.

We affirm.

## I. ISSUES

NGP alleges four errors:

1. Whether the trial court's failure to answer a jury question in open court is plain error, mandating reversal;

2. Whether the jury's verdict and judgment are contrary to Wyoming law relating to an owner's liability to employees of an independent contractor;

3. Whether, even if NGP breached duties it owed to Plaintiff, that breach was the proximate cause of Plaintiff's damages;

4. Whether the trial court erred in instructing the jury that violation of a statute [OSHA regulation] was evidence of negligence, when no evidence existed that NGP was responsible to enforce the regulations.

## II. FACTS

Michael Hull began working for Teton Well Service (TWS) in 1984. In June, 1992, NGP hired TWS to assist in reworking an oil well, called the "Union Pacific Number One," in the Hatfield Dome Oilfield ten miles south of Rawlins. The well was going to be "fracked."[1] TWS was to pull the tubing out of the well, remove the bridge plug, test the tubing, place a packer in the well and acidize[2] it in preparation for the "frac" job. After the "frac" job was completed by another contractor, TWS was to trip back into the well to circulate (remove) the sand that accumulates on top of the bridge plug as a result of the "frac" job.

June 9, 1992, was the TWS crew's first day on site. From June 9 until June 11, TWS prepared the well for the "frac" job. On June 11, Black Warrior, another contractor, came to the site to perforate the well.[3] On Friday, June 12, BJ Services, yet another contractor, brought 500 gallons of acid to the lease to acidize the well. June 13 and 14 fell on a weekend; the crews did not work on those days. The well was "fracked" by BJ Services on June 15. TWS began circulating sand off the bridge plug on June 16. The next day (June 17), the TWS crew was still circulating sand.

Mike Hull was on deck using power tongs to connect the joints of tubing already in the well with the chicksan and kelly hose, which had been raised over thirty feet in the air. OSHA regulations require that safety cables be used to fasten the kelly hose and the standpipe end to the derrick and at the swivel end to the swivel housing. However, on this occasion, the safety chains were not in use. As Hull turned the tubing on the floor, the chicksan overhead bound up and did not turn. As the tubing on the floor turned, the swage unscrewed and the swage, chicksan (which alone weighed approximately fifty pounds) and kelly hose fell, striking Hull in the back of the hard hat and driving him onto the rig floor. Mike Hull sustained many

1. "Fractured."
 Fracturing is a method of increasing the flow of oil or gas into a well. Production of individual wells often decreases because the underground formation is not sufficiently permeable to allow the oil to move freely toward the well. When this happens nature may be given a big boost by fracturing the formation around the well.
 Fracturing forces open underground channels so oil can flow to the well more easily. A specially treated fluid is pumped into the producing well under high pressure, fissuring the reservoir rock. When the pressure is released and the fluid flows back into the well, so-called propping agents in the fluid remain behind to keep the fissures open and permit the oil to flow toward the well more easily. These propping agents may be sand, metal, chemically compounded pellets or even walnut shells.
 Mobil Oil Corp., *The Language of Oil: Understanding Oil Talk ... A Ready Reference to Over 100 Frequently Used Oil Industry Expressions* 33 (1974).

2. Acidizing involves the treatment of limestone or carbonate formations whereby acids are applied under pressure to increase production. This is accomplished when acid enters natural crevices or crevices caused by hydraulic pressure, or when it invades the natural permeability system of the formation. Hydrochloric acid is the most commonly used acidizing fluid, though other acids such as hydrochloric-hydrofluoric, acetic or formic, or sufamic acids might also be used. The two basic types of acidizing are "matrix acidizing" and "fracture acidizing"....
 In fracture acidizing acid is injected into the formation at pressures greater than fracturing pressure. The primary purpose of fracture acidizing is to achieve productivity levels greater than those afforded by the natural reservoir. It is also used in some instances to bypass damaged areas within the well bore.
 Philip F. Lynch, *A Primer in Drilling & Production Equipment*, Vol. 3: Downhole Operations 74 (1981).

3. Perforating involves the piercing of the casing wall to provide access to petroleum flow into the well bore or to provide holes through which fluids may be pumped into the annulus space between the casing and the formation wall. A perforating gun is lowered into the well bore to fire "bullets" or "jet charges" through the casing wall.
 LYNCH, *supra*, at 66.

injuries, including a traumatic brain injury, linear skull fracture, fractured clavicle, and fractures of both lower left leg bones in the ankle area. His injuries required immediate brain surgery, performed in Casper after being airlifted from the Rawlins hospital.

Hull filed suit against NGP (and Amoco Production Company, which was subsequently dismissed by stipulation), alleging that NGP was negligent and had exercised direct control over the work-over rig hired to do clean up work on a well where NGP was the operator. Hull alleged, among other things, that NGP breached various duties of care it owed Hull as an employee on the work-over rig and Hull was injured as a result. Issues presented to the jury included NGP's direct liability for its own acts, as well as vicarious liability for its conduct in directing TWS employees' actions.

After a jury trial, a verdict was rendered against NGP, finding it responsible for ninety percent of the fault. The remainder of the fault was split between Hull (four percent), John Nodolf (the driller) (five percent), and Jack Wiggins (the derrick hand) (one percent). Damages were fixed at $1,617,160.

NGP filed a motion for judgment notwithstanding the verdict, to alter or amend the judgment, or for a new trial, which was denied. NGP appeals both the judgment and the trial court's order denying its post-trial motions.

### III. DISCUSSION

#### A. . An owner's liability to employees of an independent contractor

This court has previously adopted the general proposition set forth in RESTATEMENT (SECOND) OF TORTS § 409 (1965), stating that "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." *Hill v. Pacific Power & Light Co.*, 765 P.2d 1348, 1349 (Wyo.1988). *See also, Stephenson v. Pacific Power & Light Co.*, 779 P.2d 1169, 1176 (Wyo.1989); *Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890, 898 (Wyo.1986); *Noonan v. Texaco, Inc.*, 713 P.2d 160, 164–67 (Wyo.1986); 41 AM.JUR.2D *Independent Contractors* § 24 (1968).

■ This Court has previously held that the owner of the workplace who employs an independent contractor and

> retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety owes a duty of reasonable care to an employee of the independent contractor even if the employee is injured doing the very work the [independent] contractor was hired to perform.

*Jones,* 718 P.2d at 896 (citations omitted). *See also Cockburn v. Terra Resources, Inc.,* 794 P.2d 1334, 1342 (Wyo.1990); *Stephenson,* 779 P.2d at 1177; *Hill,* 765 P.2d at 1349; *Brewster v. Salveson Construction,* 765 P.2d 1350 (Wyo.1988); *Stockwell v. Parker Drilling Co.,* 733 P.2d 1029, 1033 (Wyo.1987). However,

> the owner "must retain more than the general right to order the contractors to stop work, to inspect the progress of the work, to make recommendations thereon, or to prescribe alterations or deviations in the work" [*Stockwell,* 733 P.2d at 1033] in order to impose liability under that rule. The product of our precedent is that an employer of an independent contractor, although potentially responsible for injuries to employees of the contractor, must assume a controlling and pervasive role in the work being done in order to generate any duty of care sufficient to establish vicarious liability for the negligence of the independent contractor.

*Cockburn,* 794 P.2d at 1342 (citations omitted). *See also, Johnston v. Conoco, Inc.,* 758 P.2d 566 (Wyo.1988).

■ Our first area of inquiry would ordinarily be to the written contract between NGP and TWS. Although the contract is not conclusive evidence of the status of the relationship between parties, it is a strong indication of the association intended. *See Noonan,* 713 P.2d at 165. In this case, however, no written contract exists. Duane Winkler testified that NGP does not normally enter into written agreements with workover companies, and did not enter into a written contract with TWS. We, therefore, must look to the record to determine whether NGP con-

trolled, or had a right to control, TWS' performance sufficient to establish a duty to TWS' (an independent contractor's) employees.

> The employer may exercise a limited control over the work without rendering the contractor a mere servant or employee, as a relation of master and servant or employer and employee is not inferable from a reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative, so long as he does it in accordance with the contract. *The control of the work reserved in the employer which affects a master-servant relationship is control of the means and manner of performance of the work,* as well as of the result; an independent contractor relationship exists where the person doing the work is subject to the will of the employer only as to the result, but not as to the means or manner of accomplishment.... A requirement that the work be performed according to standards and specifications imposed by the owner is not sufficient to establish the degree of control necessary to make a presumably independent contractor the agent of the owner, *but the retention of the right not only to insure conformity with specifications, but also the retention or exercise of the right to direct the manner in or means by which the work shall be performed, will destroy the independent status of the contractor.*

41 Am.Jur.2d *Independent Contractors* § 8 (1968) (emphasis added); *and see Noonan,* 713 P.2d at 164–66. In examining the record, we find the following indicia of the extent of NGP's control over TWS:

1. NGP, through its agent, Duane Winkler, controlled the equipment to be used to complete the TWS' crew's tasks. Testimony showed that John Nodolf, TWS' rig operator on this job, asked Winkler for a tubing swivel.[4] Winkler replied that they would not need one, could get by with the chicksan, and NGP would not provide the tubing swivel. Nodolf told Winkler that he did not like to use chicksans because "sometimes they bind up"; he thought he mentioned to Winkler that the use of a chicksan to circulate sand in this instance would not be safe. The decision to use the chicksan stood.[5]

The TWS' crew, left to their own manner of performance, would have used a tubing swivel to complete this task. NGP, through Winkler, mandated that the TWS' crew could not have the tubing swivel they felt was proper for the job they were hired to perform on the Natural Gas Processing location.

2. NGP instructed the TWS' crew in the manner of completion of their performance. When the TWS crew first attempted to make the connection between the chicksan and the pipe to be used in circulation, they tried to attach the chicksan to the tube by hoisting a worker up into the air to the top of the joint to make the connection. Winkler directed the crew to make the connections on the floor of the rig instead because they were taking too much time.

The TWS' crew took specific directions from Winkler regarding the performance of their jobs. Mike Hull remembered that Winkler told him to start scooping off the sand that was circulating out of the well.

3. NGP controlled the pace of the TWS' crew's performance. Each member of TWS' crew testified that Winkler had driven them to work faster. *See, e.g.,* (John Nodolf: "[H]e was wanting us to go fast.... He was ... always there kind of riding you, or trying to get you to go a little faster"); (Jack Wiggins, the derrick hand: "I'd jog over there [from the pump

---

4. Uncontroverted testimony showed that it would have been NGPs' responsibility to provide a tubing swivel for use at the worksite.

5. Although NGP, through Winkler, directed the TWS' crew to use a chicksan to circulate sand off the top of the bridge plug, it was unaware that an OSHA regulation existed requiring the chicksan and kelly hose to be tied off. The chicksan and kelly hose were not tied off at the time of the accident. Winkler also testified that, as a safety operation, he knew the chicksan and kelly hose should have been tied off. After the accident, Winkler admitted having in mind, at the hospital, that the chicksan and kelly hose connection, which Winkler directed them to make up on the floor, had not been chained off.

back to the deck] or walk or run.... Mainly jog, because we were always at a high rate of speed.... [E]ver since I started working for him, it's been go, go, go"); (Mike Hull, the floor hand: "There's been some days you never even shut down for lunch or nothing. You just worked through and worked through. Some days might be shorter days, and some days you might be out there for fourteen, eighteen hours a day. If they wanted to get something done, you just stayed there and did it.").

 Had NGP merely retained the right to supervise or inspect TWS' work as it progressed to determine whether the work was completed according to plan, TWS would have retained its independent contractor status and NGP would not be liable for TWS' negligence. When the employer of the independent contractor directs the manner of the independent contractor's performance, as NGP did here, the independent contractor is no longer free to manage its own operation and direct his own employees. At this point, the independent contractor's employer has abandoned the protection of the "independent contractor" rule, and owes the independent contractor's employees a duty of reasonable care.

Winkler's actions at the work site went beyond making general suggestions or recommendations; he told the rig hands what to do, how and when to do it, and what equipment they were to use. In undertaking to control the work site operations, Winkler abandoned (for NGP) the protection of the "independent contractor" rule.

### B. The proximate cause of Mike Hull's damages

 Proximate cause is the notion that "the accident or injury must be the natural and probable consequence of the act of negligence." *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722, 726 (Wyo.1987) (quoting *McClellan v. Tottenhoff*, 666 P.2d 408, 414 (Wyo.1983)). Normally, proximate cause is a question of fact unless the evidence is such that reasonable minds could not disagree. *Buckley v. Bell*, 703 P.2d 1089, 1092 (Wyo.

1985); *Caterpillar Tractor Co. v. Donahue*, 674 P.2d 1276, 1283 (Wyo.1983).

Legal causation has been defined as that conduct which is a substantial factor in bringing about the plaintiff's injuries. *Buckley*, 703 P.2d at 1091.

[I]f the conduct is "that cause which in natural and continuous sequence, unbroken by a sufficient intervening cause produces the injury, without which the result would not have occurred," it must be identified as a substantial factor in bringing about the harm. If, however, it created only a condition or occasion for the harm to occur then it would be regarded as a remote, not a proximate, cause, and would not be a substantial factor in bringing about the harm.

*Buckley*, 703 P.2d at 1092 (*quoting Lemos v. Madden*, 28 Wyo. 1, 10, 200 P. 791, 793 (1921)). *See also, Bettencourt*, 735 P.2d at 726.

 Appellant argues that the sole proximate cause of Mike Hull's injuries was the TWS' crew's failure to attach the safety chains. We disagree, because the record supports findings of concurrent causes.

 "Concurrent negligence" involves acts of negligence of two or more people that, although not working in concert, combine to produce a single injury. *Green v. Sellers*, 413 P.2d 522, 528 (Okl.1966). More than one proximate cause can exist for an accident or injury. Each concurrent cause that contributes directly to the accident or injury is a "proximate cause." " '[W]here injury results from two separate and distinct acts of negligence by different persons operating and concurring simultaneously and concurrently, both are the proximate cause and recovery may be had against either or both of the responsible persons.' " *Hester v. Coliseum Motor Co.*, 41 Wyo. 345, 353, 285 P. 781 (1930) (quoting *DeWees v. Kuntz*, 280 P. 552 (Cal.App.1929)). *See also, Frazier v. Pokorny*, 349 P.2d 324 (Wyo.1960); *Phelps v. Woodward Constr. Co.*, 66 Wyo. 33, 204 P.2d 179 (1948).

Mike Hull's injuries were caused by a string of events, which culminated in the June 17 accident. Both the hurried atmosphere at the worksite and the failure to

attach the safety chains to the chicksan and kelly hose were contributing factors:

1. The hurried atmosphere—Appellee's expert, Jerry Warren, stated that he did not feel the crew should have been pressured. He felt that the crew was "rushed so much that they didn't have time to stop and think what they were doing." John Nodolf said, "[M]aybe if we weren't working ... in a rush to try to get everything done, we might have thought about putting the safety cable on." Jack Wiggins, the derrick hand, testified that, based upon his observations and his years of experience in the oil field, "being rushed" was the cause of Mike Hull's injury.

2. The failure to attach the safety chains—Duane Winkler, NGP's on-site representative, admitted knowing that, as a safety precaution, the kelly hose and chicksan should be tied off. He failed, however, to instruct the crew to attach the safety chains on the date of the accident. Testimony in the record shows that this was not the first time Winkler had failed to see that the safety chains were attached. Likewise, the TWS crew knew that the safety chains should have been attached to the chicksan and kelly hose and failed to attach them as required by OSHA regulations.

The jury was instructed on comparative fault and was asked to determine the percentage of fault attributable to each of the parties involved in the accident. After its deliberations, the jury found four different individuals/entities negligent with regard to the June 17 accident: NGP (Appellant), Mike Hull (Appellee), John Nodolf (the driller/rig operator), and Jack Wiggins (the derrick hand). The jury recognized that more than one proximate cause existed and so noted in its verdict. Evidence adduced at trial supports the jury's finding that concurrent causes existed for Hull's injuries.

C. *Jury instruction regarding violation of an OSHA regulation as evidence of negligence*

■ Appellant does not dispute that violation of a regulation is evidence of negligence. Further, Appellant argues that no

evidence existed which showed that NGP was the entity required to comply with the regulations at issue.

Among the jury instructions was the following:

Violation of a statute is evidence of negligence. If you determine that a party violated a statute on the occasion in question and that the violation was a [proximate] [direct] cause of the occurrence, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not the party was negligent at the time of the occurrence.

The OSHA regulation in question reads as follows:

No person shall cause the servicing work to commence until the contractor or subcontractor, as appropriate, has declared his equipment and employees are safely prepared to proceed.

*Rules and Regulations for Oil and Gas Well Servicing,* State of Wyoming Occupational Health and Safety Department, Chapter II, Section 1(f) (1990).

We find no error in this instruction.

The regulation is self-explanatory; it applies to *any person* who causes the oil and gas well servicing work to commence. The issue is not whether NGP was obligated to enforce this regulation, rather, the issue is whether NGP violated its obligation by causing servicing work to commence.

Substantial evidence was adduced which showed that either TWS or NGP (as well as their employees), or both, commenced the servicing work before the contractor or subcontractor had declared that the equipment was safely prepared to proceed. Sufficient evidence existed on the record to allow this instruction to be submitted to the jury. The jury was properly instructed.

D. *The trial court's failure to answer a jury question in open court*

■ Appellant urges that this court's prior decision, *Rissler & McMurry v. Snodgrass,* 854 P.2d 69 (Wyo.1993), makes failure of the trial court to answer questions from

the jury in open court plain error "mandat[ing] a new trial."

The scope of *Rissler* must be defined by the facts of that case. *Rissler* involved an eminent domain action. During jury deliberations, the jury in *Rissler* sent a note to the trial court. Neither the jury's note to the court nor the trial court's response were made of record. Jurymen's affidavits made after the fact stated that the jury's note requested an instruction on whether they could fix their own value (damages) or were bound to accept a value fixed by a witness. The jury's verdict was returned in the amount of $182,034 for 5.45 acres of land taken for a mine haul road across pasture land. The *Rissler* opinion found plain error had been committed in the trial court's failure (1) to return the jury to open court for instruction [Wyo.Stat. § 1–11–209 (1988)], and (2) to make the jury instruction part of the record [Wyo.Stat. § 1–11–205(a)(vii) (1988)]. Although not fully developed in the opinion, *Rissler* involved prejudice to the appellant as a result of that error, and therefore, the case was remanded for a new trial.

The facts here are substantially different from *Rissler*. The question from the jury, as well as the trial court's answer, appear of record. Counsel for both parties discussed the answer to the jury's question with the court, and together formulated an answer to which both counsel consented. NGP has failed to show any prejudice by the trial court's failure to answer the jury question in open court. Wyo.R.App.P. 9.04. We have searched this record and find no error that, to leave uncorrected, "would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process" [*Abdullah v. Gunter*, 242 Neb. 854, 497 N.W.2d 12, 15 (1993)]; neither are we convinced that the claimed error "possessed a clear capacity to bring about an unjust result." *Gluckauf v. Pine Lake Beach Club, Inc.*, 78 N.J.Super. 8, 187 A.2d 357, 366 (1963).

We do not interpret *Rissler* as obviating the need for the harmless error doctrine. Since NGP was not prejudiced, any potential error is harmless.

## IV. CONCLUSION

Evidence adduced at trial showed NGP retained the right to direct the manner of TWS' performance, and therefore, owed a duty of reasonable care to TWS' employees. Concurrent causes existed for Mike Hull's injuries; the jury was instructed on comparative negligence and allocated the fault. The jury was properly instructed regarding violations of statutes as evidence of negligence. *Rissler* does not obviate the need for the harmless error doctrine. As NGP was not prejudiced, any potential error is harmless. Affirmed.