2006 WY 42

**Lee Ann KILLIAN and Donna Oakley, as co-personal representatives of Jeffrey Christopher Pool, deceased, and the Estate of Jeffrey Christopher Pool, deceased, Appellants (Plaintiffs),**

v.

**CAZA DRILLING, INC., a Colorado corporation; and Orville Long, Appellees (Defendants).**

No. 05–37.

Supreme Court of Wyoming.

April 7, 2006.

Robert N. Williams of Meyer and Williams, Jackson, Wyoming, and James K. Lubing of James K. Lubing Law Office, Jackson, Wyoming, for Appellants. Argument by Mr. Williams.

George Santini of Ross, Ross & Santini, LLC, Cheyenne, Wyoming, For Appellee

Caza Drilling, Inc. Gary R. Scott and Robert C. Jarosh of Hirst & Applegate, PC, Cheyenne, Wyoming, for Appellee Orvil Long, for Appellees. Argument by Messrs. Santini and Jarosh.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

HILL, Chief Justice.

[¶ 1] Lee Ann Killian and Donna Oakley (collectively Appellants) are co-personal representatives of the estate of Jeff Pool, who was killed when he was struck by a vehicle driven by an employee of Caza Drilling, Inc. (Caza). On behalf of the estate, Appellants filed an action against Caza and Orvil Long, the supervisor of the employees involved in the accident, alleging that they negligently allowed the employees to drink alcohol on company premises in violation of Caza policy. The district court granted summary judgment for the defendants concluding that Caza and Long did not owe a duty to Pool, and that their actions were not the proximate cause of his death. We agree that there was no duty and affirm.

## ISSUES

[¶ 2] Appellants set forth the following issues:

A. Does a duty to the motoring public arise where an employee became intoxicated on company premises with the corroboration and knowledge of his supervisor and in violation of a company policy expressly adopted to protect the public?

B. Is the Wyoming Dram Shop Act applicable to the facts of this case?

C. Is court-ordered counseling one of the express exceptions to a privilege under W.S. § 33–38–103?

Caza sets out the following issues:

1. Should this Court create a duty on the part of employers which have adopted policies prohibiting worksite possession or consumption of alcohol greater than those recognized under the Wyoming Dramshop Act?

2. Can an employer be held vicariously liable for off duty, off premises torts committed by employees or ex-employees?

3. Was there a legally recognizable duty owed by Caza Drilling to the Appellant?

4. Assuming such a duty exists, was the death of Jeffrey Pool so far attenuated and disconnected from the breach of the duty to the extent that any such breach as a matter of law could not be a proximate cause?

Long responds with the following:

1. Does Wyoming Statute Annotated § 12–8–301 immunize Orvil Long from liability for damages resulting from the accident that caused Jeffrey Christopher Pool's death?

2. If Wyoming Statute Annotated § 12–8–301 does not immunize Orvil Long from liability for damages resulting from the accident that caused Jeffrey Christopher Pool's death, does Wyoming law impose a duty upon Long, under the circumstances of this case, to protect against the harm caused to Pool?

3. Did the trial court abuse its discretion in ordering that information regarding Orvil Long's alcohol counseling, which was court-ordered in an unrelated case, was confidential pursuant to Wyoming Statute Annotated § 33–38–113?

## FACTS

[¶ 3] On April 15, 2001, Clint Hammers (Hammers) and Wyatt Ditterline (Ditterline) were employed by Caza on a drilling crew working on Rig 73, near Marbleton, Wyoming. Long was the driller and supervisor of the crew. At 6:30 that morning, the crew finished a twelve-hour shift and retired to Caza's mancamp, which was located about five miles from the rig site. The mancamp consisted of a trailer provided without cost by Caza to its employees while they worked at the rig site. Although employees were not required to stay at the mancamp, Hammers, Ditterline, and Long elected to do so.

[¶4] Caza prohibited the possession or consumption of alcohol at its mancamp. The policy was posted on the trailer door at the mancamp. Hammers and Ditterline were aware of the policy. Nevertheless, the policy was not enforced. After returning to the mancamp on April 15, members of the crew, including Hammers, Ditterline, and Long, began drinking. After a couple of hours, Hammers and Ditterline left the mancamp in Ditterline's truck with Hammers driving. Initially, Hammers and Ditterline went to the rig site, where they allegedly smoked marijuana with another Caza employee.[1] They then decided to go see Hammers' new cabin in Dubois. After a brief stop in Jackson, they headed north on U.S. Highway 191. At approximately 1:30 p.m. Hammers was driving about sixty-five miles per hour near the Jackson Hole Airport when he struck Jeff Pool, who was riding his bicycle. Pool was killed instantly. Hammers and Ditterline were arrested a short time later after fleeing the scene. Subsequently, Hammers pleaded guilty to aggravated homicide by vehicle and hit and run while Ditterline pleaded guilty to aiding and abetting hit and run.

[¶5] On April 14, 2003, Appellants filed a wrongful death action against numerous individual and corporate defendants alleging that their negligent misconduct resulted in the death of the decedent.[2] Caza and Long filed motions for summary judgment. After a hearing, the district court granted the motions concluding that Caza and Long were "entitled to judgment as a matter of law because there is no duty of care owed by these Defendants to the Plaintiff's [sic] or Plaintiffs' decedent." Alternatively, the court found that "even if defendants owed some duty of care to Jeffrey Pool[,] Summary Judgment is still appropriate for defendants because there is no proximate cause as a matter of law." Appellants appeal.[3]

1. Hammers and Ditterline claimed in their deposition testimony that they had smoked the marijuana. Blood samples drawn after the accident, however, did not disclose any evidence of marijuana consumption.

2. All defendants except Caza and Long have been dismissed from this action by stipulation.

## STANDARD OF REVIEW

[¶6] Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.... A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted.... The movant bears the initial burden of establishing a prima facie case for summary judgment. If the movant carries his burden, the party who is opposing the motion for summary judgment must present specific facts to demonstrate that a genuine issue of material fact exists.... This court evaluates the propriety of a summary judgment by employing the same standards and by using the same materials as the district court employed and used. We examine the record in the light most favorable to the party who opposed the motion for summary judgment, and we give that party all the favorable inferences that may fairly be drawn from the record. We accord no deference to the district court's decisions on issues of law.

*Christensen v. Carbon County,* 2004 WY 135, ¶8, 100 P.3d 411, 413–14 (Wyo.2004) (quoting *Metz Beverage Company v. Wyoming Beverages, Inc.,* 2002 WY 21, ¶9, 39 P.3d 1051, 1055 (Wyo.2002)).

## DISCUSSION

[¶7] Through application of the doctrine of respondeat superior, an employer is only liable for the negligence of an employee who is acting within the scope of his employment. *Romero v. Schulze,* 974 P.2d 959, 964 (Wyo.1999); *Austin v. Kaness,* 950 P.2d 561, 563 (Wyo.1997).

3. On appeal, Appellants challenge the district court's summary judgment rulings on duty and proximate cause. They also challenge a district court discovery ruling that prohibited access to records from court-ordered alcohol counseling imposed on Long in another judicial proceeding. Because of our determination that there was no duty, we do not need to address the discovery issue.

The conduct of an employee is within the scope of his employment "only if it is of the kind he is employed to perform; it occurs substantially within the authorized time and space limits; and it is actuated, at least in part, by a purpose to serve the master." [*Hamilton v. Natrona County Education Association*, 901 P.2d 381, 385 (Wyo.1995) ] (*citing Miller v. Reiman–Wuerth Co.*, 598 P.2d 20, 22 (Wyo.1979)); *see also Restatement (Second) of Agency*, § 228 (1958).

*Austin*, at *Id.* There is no contention that Hammers and Ditterline were acting within the scope of their employment at the time of the accident. Rather, Appellants ask us to expand the recognized circumstances in which an employer is liable for the negligence of its employees by imposing a duty directly upon the employer when it has adopted a safety policy with the intent to benefit the public. Appellants cite the following language from Caza's employee safety manual:

SECTION 1—SAFETY POLICY AND PROGRAM

1.1 INTRODUCTION

The management of CAZA Drilling Inc. is sincerely committed to providing a safe and healthful workplace. Safety is an integral part of our Company's work. It is part of our daily operations and is there to protect our employees, customers, contractors, property, the environment, and the public.

. . . .

Everyone employed by CAZA is responsible for maintaining the safety program. Managers and supervisors are responsible for identifying safety needs . . . and informing supervisors of any unsafe conditions . . .

As a CAZA Drilling Inc. employee, you are expected to comply with all applicable CAZA safety rules, to perform all duties in a safe and workmanlike manner, and promote safety awareness among fellow employees . . .

. . . .

1.3 GENERAL POLICY STATEMENT—DRUGS, ALCOHOL, FIREARMS, & OTHER HAZARDS.

CAZA Drilling Inc. subscribes to the following policy regarding illegal drugs, alcoholic beverages, firearms, explosives, or other hazardous conditions:

1. The possession, use, sale or distribution of any illegal controlled substance(s) or being under the influence of same, by any employee while in the workplace, on company premises, or in the conduct of company-related work off-site, is prohibited. The presence of any detectable amount of any illegal drug (or any metabolities) in any employee in the company workplace, on its premises, or in the conduct of company-related work off-site is prohibited. Company vehicles, as well as private vehicles parked on company premises or worksites are locations included within this prohibition. In addition, no employee may use, possess, transport, promote, or sell alcohol, any drug or drug paraphernalia while performing work for the company or while on company property.

Appellants argue that Caza voluntarily adopted a "zero tolerance" policy regarding alcohol and drug use on company property, including the mancamps, and that the policy was specifically adopted to protect the general public. Appellants note that one who voluntarily adopts a duty must perform such in a reasonable manner. They contend that Caza knew its policy was being violated and that Long, who as supervisor was supposed to enforce the policy, actually participated in the violation. Appellants conclude it was foreseeable that a violation of the policy could lead to injury or death to members of the public. Accordingly, they insist that Caza owed a duty to the decedent and since there were material facts in dispute as to whether the duty was breached, the district court erred in granting summary judgment.

▇▇▇▇ [¶ 8] "Whether a legal duty exists is a question of a law, and absent a duty, there is no liability." *Bevan v. Fix*, 2002 WY 43, ¶ 46, 42 P.3d 1013, 1027 (Wyo.2002) (quoting *Bowen v. Smith*, 838 P.2d 186, 198 (Wyo. 1992) (Brown, J., concurring)).

" ' "Duty" is not sacrosanct in itself, but is only an expression of the sum total of

those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' " [*Andersen v. Two Dot Ranch, Inc.*, 2002 WY 105, ¶ 44, 49 P.3d 1011, 1024 (Wyo.2002) (quoting *Gates v. Richardson*, 719 P.2d 193, 195 (Wyo. 1986))]. * * * A duty may arise by contract, statute, common law, "or when the relationship of the parties is such that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff." *Hamilton v. Natrona County Educ. Ass'n*, 901 P.2d 381, 384 (Wyo.1995). The legal question to be answered by the court is

> " ' "[w]hether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant. This is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." ...' "

*Thomas By Thomas v. South Cheyenne Water and Sewer Dist.*, 702 P.2d 1303, 1307 (Wyo.1985) (*quoting* Prosser, Law of Torts, § 37 at 206 (4th ed.1971) and *Caterpillar Tractor Co. v. Donahue*, 674 P.2d 1276, 1280 (Wyo.1983)).

In deciding whether to adopt a particular tort duty, a court's focus must be much broader than just the case at hand:

> "[T]he courts have merely 'reacted to the situation in the way in which the great mass of mankind customarily react,' and that as our ideas of human relations change the law as to duties changes with them. Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others. Changing social conditions lead constantly to the recognition of new duties. No better general statement can

be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." Prosser & Keaton on Torts, § 53, pp. 357–359 (5th ed.1984).

> " * * * The judge's function in a duty determination involves complex considerations of legal and social policies which will directly affect the essential determination of the limits to government protection. Consequently, * * * the imposition and scope of a legal duty is dependent not only on the factor of foreseeability. ( [*Cunis v. Brennan* ] 56 Ill.2d 372, 375, 308 N.E.2d 617) but involves other considerations, including the magnitude of the risk involved in defendant's conduct, the burden of requiring defendant to guard against that risk, and the consequences of placing that burden upon the defendant. [Citations.]" *Nelson by Tatum v. Commonwealth Edison Company*, 124 Ill.App.3d 655, 662, 80 Ill.Dec. 401, 465 N.E.2d 513, 519 (1984).

*Mostert v. CBL & Assoc.*, 741 P.2d 1090, 1093 (Wyo.1987). In *Gates*, 719 P.2d at 196, we further detailed the factors to be considered:

> Some of the key policy factors to be considered are: (1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved. *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342, 83 A.L.R.3d 1166 (1976).

*Borns ex rel. Gannon v. Voss*, 2003 WY 74, ¶¶ 30–31, 70 P.3d 262, 273–74 (Wyo.2003).

[¶ 9] In support of their position, Appellants rely on a case from the North Carolina Court of Appeals: *Peal by Peal v. Smith*, 115 N.C.App. 225, 444 S.E.2d 673 (1994). The

defendant Smith worked for Cianbro Corporation. In Cianbro's Employee Information Handbook was the following policy statement: "No person under the influence of alcohol, marijuana, or non-prescription drugs shall be allowed on the project work site." 444 S.E.2d at 675, 677. After work, ten or twelve Cianbro employees, including Smith, met in the company's parking lot to drink beer. *Id.* at 675. Supervisory personnel were aware of the activity. After Smith consumed some beers, he left the premises in his vehicle. As he was proceeding across a bridge approximately two miles from the company property, he drove his car across the centerline and collided head on with another vehicle killing one occupant of that vehicle and causing permanent and debilitating brain damage to another, the plaintiff. *Id.* Testimony from witnesses of the accident scene indicated that Smith was obviously alcohol-impaired.

[¶ 10]   The plaintiff joined Cianbro to her suit against Smith alleging that the company "failed to enforce or carry out their own regulations, which, on information and belief, would have prevented the defendant Smith from becoming intoxicated on their business premises and then departing to operate an automobile on the highway in that condition[.]" *Peal,* 444 S.E.2d at 676. A jury returned a verdict in favor of the plaintiff. Among the issues raised on appeal by Cianbro was whether it owed a duty to the plaintiff. The Court of Appeals concluded that it did. First, noting the presence of the drug and alcohol policy in the employee handbook, the court observed that in North Carolina, "the breach of a voluntarily adopted safety rule is some evidence of [a] defendant's negligence." *Id.* at 677. From that, the court concluded "that on the facts of this case the safety rule adopted in the employee handbook by the corporate defendants was some evidence of a standard of care." *Id.* at 678. Later, the court noted that Cianbro's supervisory personnel were aware of the policy and that it was being regularly violated. *Id.* at 679. The court stressed that there was testimony from supervisors that the policy was adopted "not only to protect the employees on site, *but also to prevent accidents*

*involving Cianbro employees and the public." Id.* (Emphasis in original.)

[¶ 11]   The court then turned to § 317 of the Restatement (Second) of Torts for support in determining whether a duty was owed to the plaintiff:

Section 317 states that:

A master is under a duty to exercise reasonable care so as to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

. . . .

Clearly, the use of the master's chattel is inapplicable under the facts of this case, nor is the cause of action grounded in negligent supervision. In our situation, we have an employer who could control the employee so as to prevent harm to third persons; the employee was on premises in possession of the employer; the employer knew or had reason to know that he could control the employee, and knew or should have known that there was the necessity and the opportunity to exercise that control over the employee. Thus, the elements of a common law duty in a master/servant relationship as described by the above section of the Restatement have been met.

*Peal,* 444 S.E.2d at 678–79. The court then reached its conclusion:

We agree that the corporate defendants' establishment and memorialization of a[sic] alcohol policy standing alone did not sub-

ject them to liability. However, the common law duty of a master to control his servant under certain circumstances as outlined in Restatement § 317, taken together with the defendants' own written policies established a standard of conduct that if breached could result in actionable negligence. .

*Peal*, 444 S.E.2d at 679. Having found a duty, the court upheld the jury verdict in favor of the plaintiff. *Id.* at 681.

▇▇▇ [¶ 12] For several reasons, we do not find the *Peal* case to be particularly persuasive authority. First, the court takes the unremarkable proposition that the violation of a safety rule may be evidence of a standard of care, and concludes that it supports finding a duty on behalf of the defendant corporation for the actions of an employee acting outside the scope of his employment. Standard of care and duty are not synonymous concepts. Of the cases cited by the court in support of its conclusion, two were situations wherein the defendant's employee was acting within the scope of his employment, *Klassette v. Mecklenburg County Area Mental Health,* 88 N.C.App. 495, 364 S.E.2d 179 (1988) (plaintiff patient sued clinic for negligent medical treatment), *Robinson v. Seaboard System R.R., Inc.,* 87 N.C.App. 512, 361 S.E.2d 909 (1987) (plaintiff driver sued engineer of train and his employer for damages arising out of train-car collision), one was a case of negligent hiring, *Blanton v. Moses H. Cone Memorial Hospital, Inc.,* 319 N.C. 372, 354 S.E.2d 455 (1987) (plaintiff patient sued Hospital for granting clinical privileges to doctor without ascertaining whether the doctor was qualified), and the other was a product liability case, *Wilson v. Lowe's Asheboro Hardware, Inc.,* 259 N.C. 660, 131 S.E.2d 501 (1963) (plaintiff alleged that ladder sold by defendant was not constructed in compliance with the American Standard Safety Code for Portable Wooden Ladders). In all of these cases, a duty was owed by the defendant to the respective plaintiffs independently of any consideration of whether or not a safety rule was violated. That principle was relevant only to the extent that it was considered evidence that the defendants breached their duty. The holdings of these cases do not support the conclusion of the *Peal* court.

[¶ 13] In addition, the decision misapplies the Restatement. As noted above, Section 317 states that an employer is under a duty to exercise reasonable care to control the activities of his employees when they are acting outside the scope of their employment so as to prevent intentional harm to others if: (1) the employee is upon the employer's premises or is using the chattel of the employer; and (2) the employer knows or has reason to know that it has the ability to control the employee and that it knows or should know of the necessity and opportunity for exercising control. Restatement (Second) Torts § 317 (1965). The *Peal* court predicated its finding of a duty partially on the fact that the defendant's "employee was on premises in possession of the employer." The problem with the court's reasoning is that the defendant's employee in *Peal* was not on the employer's premises when the accident occurred. The Restatement only imposes a duty on the employer to prevent harm to others when the employee is on the employer's premises:

> A master is required to police his own premises, and those upon which, though in the possession of another, he has a privilege of entry for himself and his servants, *to the extent of using reasonable care to exercise his authority as a master in order to prevent his servant from doing harm to others.* So too, he is required to exercise his authority as master to prevent them from misusing chattels which he entrusts to them for use as his servants. This is true although the acts of the servant while upon the premises or in the use of the master's chattels are done wholly for the servant's own purposes and are, therefore, outside the course of the servant's employment and thus do not subject the master to liability under the rules of the law of Agency. *On the other hand, the master as such is under no peculiar duty to control the conduct of his servant while his is outside of the master's premises,* unless the servant is at the time using a chattel entrusted to him as servant. Thus, a factory owner

is required to exercise his authority as master to prevent his servants, while in the factory yard during the lunch hour, from indulging in games involving an unreasonable risk of harm to persons outside the factory premises. *He is not required, however, to exercise any control over the actions of his employees while on the public streets* or in a neighboring restaurant during the lunch interval, even though the fact that they are his servants may give him the power to control their actions by threatening to dismiss them from his employment if they persist.

Restatement (Second) Torts § 317, comment b (emphasis added). See also *Stephenson v. Universal Metrics, Inc.,* 247 Wis.2d 349, 633 N.W.2d 707, 714–15 (App.Ct.2001); *Brezenski v. World Truck Transfer, Inc.,* 755 A.2d 36, 41–42 (Pa.Super.Ct.2000); *Riddle v. Arizona Oncology Services, Inc.,* 186 Ariz. 464, 924 P.2d 468, 472–73 (App.Ct.1996); *D'Amico v. Christie,* 71 N.Y.2d 76, 524 N.Y.S.2d 1, 518 N.E.2d 896, 901–02 (1987); and *Pursley for the Benefit of Clark v. Ford Motor Company,* 462 N.E.2d 247, 250–51 (Ind.App.1984). Section 317 was not applicable to the situation before the *Peal* court.

[¶ 14] The appellate court decision in *Peal* was appealed to the North Carolina Supreme Court, which affirmed per curiam after one justice recused and those remaining split their vote. *Peal by Peal v. Smith,* 340 N.C. 352, 457 S.E.2d 599 (1995). The *Peal* case came out in 1994 and has been cited in only three subsequent cases, all from North Carolina. *See Estate of Mullis by Dixon v. Monroe Oil Company,* 349 N.C. 196, 505 S.E.2d 131, 136 (1998); *Thompson v. Wal-Mart Stores, Inc.,* 138 N.C.App. 651, 547 S.E.2d 48, 51 (2000); and *Norris v. Zambito,* 288, 135 N.C.App. 288, 520 S.E.2d 113, 118 (1999). None of those cases discuss the substantive holding of *Peal.* For these reasons, we do not find the case to be persuasive authority.

[¶ 15] The *Peal* case is the only authority Appellants offer in support of their position. There is authority to the contrary. In *Estate of Catlin v. General Motors Corporation,* 936 S.W.2d 447 (Tex.App.-Houston 1996) employees of Fluor Daniel held a "fish fry" on company property following a company softball game. *Id.* at 448–49. The company had adopted a safety policy forbidding consumption of alcohol on company property except at company sponsored events. *Id.* at 449–50. A violation of the policy was grounds for immediate discharge. *Id.* The safety policy required a detailed written plan regarding the consumption of alcohol, designation of a person "in charge," and special security procedures. *Id.* at 450. The organizers of the fish fry failed to comply with these procedures. *Id.* One of the employees attending the fish fry got intoxicated and, after stopping for more drinks at a bar, caused an automobile accident resulting in the death of the plaintiff's decedent. *Id.* at 449.

[¶ 16] The plaintiff argued that "because Fluor Daniel adopted a policy regarding the consumption of alcohol on its premises, and thereafter failed to follow the policy, a legal duty to third parties was created." *Estate of Catlin,* 936 S.W.2d at 451. The court stated that, as a general rule, "a person does not have a duty to control the conduct of another even when the person has the practical ability to do so." *Id.* at 450. It then noted that in Texas, an employer may be liable for the torts of off-duty employees which are committed on the employer's premises or with the employer's chattels. *Id.* at 450–51 (citing § 317 of the Restatement (Second) of Torts). That duty, the court observed, encompassed situations where because of an employee's incapacity, an employer exercised control over the employee. In those situations, the court noted that Texas law required the employer to "take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others." *Id.* at 450 (citing *Otis Engineering Corporation v. Clark,* 668 S.W.2d 307, 311 (Tex.1983)). The court found that the "narrow duty" imposed on employers to third persons by *Otis* did not apply in this case because there was no evidence indicating that Fluor Daniel or its employees knew that the employee was intoxicated and that they exerted any control over him. *Id.* at 451. The court then held:

We conclude that the mere creation of an internal policy regarding consumption of alcohol on the premises, whether or not the fish fry was a "company function," does not create a duty as set forth in *Otis*. More is required. In *Otis*, the employer *had actual knowledge* of the intoxication and then performed an *affirmative act of control*. These elements are not present in this case. To accept the Estate's argument would impermissibly extend the test set forth in *Otis* * * *. Fluor Daniel did not assume a duty to third parties by its limited activities in this case.

*Estate of Catlin*, 936 S.W.2d at 451. (Emphasis in original.)

[¶ 17] A similar argument was advanced by the plaintiff in *Premo v. General Motors Corporation*, 210 Mich.App. 121, 533 N.W.2d 332 (1995). A GM employee left work intoxicated and caused an accident, injuring the plaintiff. *Id.* at 332. In his complaint, the plaintiff alleged that GM had a policy or practice of not allowing employees to leave the workplace in their automobiles if intoxicated; instead the company would detain them and arrange alternative transportation. *Id.* The plaintiff claimed that the "practice was for the protection of both the employee and the motoring public, and that, therefore, General Motors owed [the plaintiff], as a member of the motoring public, a duty not to allow [their employee] to leave the plant in his automobile in an intoxicated state." *Id.* at 332–33. The court found that GM's "internal policy of preventing intoxicated employees from driving did not, as a matter of public policy, amount to General Motors' assumption of a duty to protect the public at large." *Id.* at 333. The court then described the public policy reasons against imposing a duty under the facts of the case:

Significant and compelling public policy reasons support a conclusion of an insufficient "undertaking" in this case. Alcohol and substance abuse is a serious societal problem causing significant human suffering and economic loss. In the work setting alcohol use and related problems undoubtedly cost employers and the national economy hundreds of millions, if not billions, of dollars each year in lost work time, efficiency, product quality, health and medical costs, workers' compensation, etc. To impose liability upon an employer who, by means of work rules, policies, etc. undertakes to address the problem of alcohol use and/or abuse is clearly against public policy and would encourage employers to abandon all efforts which could benefit such employees in order to avoid future liability.

*Premo*, 533 N.W.2d at 333. The court concluded that in "this case, the relationship between [GM] and [the plaintiff] was too remote to obligate [GM] to protect her." *Id.*; see also *Meyers v. Grubaugh*, 242 Kan. 716, 750 P.2d 1031, 1037 (1988) (State not liable for injuries caused by employee who got intoxicated on the jobsite in violation of employer's rules and regulations because absent "special circumstances, a private employer owes no duty to a third party for tortious acts of an employee who, after consuming alcohol on the employer's premises, leaves the employer's premises and while off duty injures the third party.")

[¶ 18] These cases form the background as we consider the factors set out in *Gates* to determine whether Caza and Long owed a duty of care to Appellants' decedent.

[¶ 19] *The foreseeability of harm to the plaintiff.* The question posed by the first factor is a determination of whether the harm to the plaintiff was a foreseeable consequence of the defendant's actions (or inaction, as the case may be). Here, the allegation is that the defendant assumed a duty to the general public when it adopted a safety policy prohibiting the consumption of alcohol by its employees on company property. Thus, the specific question is whether or not the harm to the plaintiff was a foreseeable consequence of Caza's knowing failure to enforce its policy.

[¶ 20] The essence of this factor is, for all practical purposes, a consideration of proximate cause:[4]

4. Unless the evidence is such that reasonable minds could not disagree, proximate cause is normally a question for the trier of fact. *Turcq v. Shanahan*, 950 P.2d 47, 52 (Wyo.1997). Howev-

Proximate cause is explained as "the accident or injury must be the natural and probable consequence of the act of negligence." *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722, 726 (Wyo.1987); *followed in, Natural Gas Processing Co. v. Hull*, 886 P.2d 1181, 1186 (Wyo.1994); *Lynch v. Norton Const., Inc.*, 861 P.2d 1095, 1099 (Wyo.1993). ***The ultimate test of proximate cause is foreseeability of injury.*** *Stephenson v. Pacific Power & Light Co.*, 779 P.2d 1169, 1178 (Wyo.1989); *McClellan v. Tottenhoff*, 666 P.2d 408, 414 (Wyo.1983). In order to qualify as a legal cause, the conduct must be a substantial factor in bringing about the plaintiff's injuries. *Natural Gas Processing Co.*, 886 P.2d at 1186; *Stephenson*, 779 P.2d at 1178.

*Turcq v. Shanahan*, 950 P.2d 47, 51 (Wyo. 1997) (emphasis added). In considering the concept of proximate cause, we have noted not only what constitutes proximate cause but what does not:

> In *Lemos v. Madden*, 28 Wyo. 1, 200 P. 791, 793 (1921), this court first defined proximate cause as "[t]hat which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." This same definition has been relied upon in recent years. *Robertson v. TWP, Inc.*, Wyo., 656 P.2d 547 (1983); *Kopriva v. Union Pacific R. Co.*, Wyo., 592 P.2d 711 (1979). In *Lemos v. Madden*, supra, 200 P. at 794, the court also rejected a "but for" rule of causation, stating:
>
>> " * * * But if the original wrong furnished only the condition or occasion, then it is the remote and not the proximate cause, notwithstanding the fact that there would have been no loss or injury but for such condition or occasion. * * * "
>
> In later cases our court has identified legal causation as that conduct which is a substantial factor in bringing about the injuries identified in the complaint.

*McClellan v. Tottenhoff*, Wyo., 666 P.2d 408 (1983); *Chrysler Corporation v. Todorovich*, Wyo., 580 P.2d 1123 (1978); *Phelps v. Woodward Construction Co.*, Wyo., 66 Wyo. 33, 33, 204 P.2d 179 (1949). The obvious rationalization of that approach with the two propositions found in *Lemos v. Madden*. supra, is that if the conduct is "that cause which in natural and continuous sequence, unbroken by a sufficient intervening cause produces the injury, without which the result would not have occurred," it must be identified as a substantial factor in bringing about the harm. If, however, it created only a condition or occasion for the harm to occur then it would be regarded as a remote, not a proximate, cause, and would not be a substantial factor in bringing about the harm.

> An alternative method for explaining these concepts is found in the discussions of intervening cause in our cases. *McClellan v. Tottenhoff*, supra; *Kopriva v. Union Pacific R. Co.*, supra; *Gilliland v. Rhoads*, Wyo., 539 P.2d 1221 (1975); *Fagan v. Summers*, Wyo., 498 P.2d 1227 (1972); and *Tyler v. Jensen*, 75 Wyo. 249, 295 P.2d 742 (1956). An intervening cause is one that comes into being after a defendant's negligent act has occurred, and if it is not a foreseeable event it will insulate the defendant from liability. It is reasonably foreseeable if it is a probable consequence of the defendant's wrongful act or is a normal response to the stimulus of the situation created thereby.

*Buckley v. Bell*, 703 P.2d 1089, 1091–92 (Wyo.1985).

[¶ 21] So the question before us now is should Caza have foreseen the harm caused to the decedent by its employees? Appellants, of course, argue that the harm to the decedent was a foreseeable consequence of the drinking by Caza's employees:

> [by adopting a no alcohol policy] it is essentially admitted that if drinking were allowed at either the mancamp or the rig location, Caza knew that a risk of harm to

er, the question of duty is one of law and for purposes of making that determination only we will consider the question.

the general public would exist. The risk of harm to third persons was increased in this case by the fact that Hammers, Ditterline, and the other workers were working twelve-hour shifts, which ended at 6:30 in the morning, when no bars are open. It was or at least should have been even more foreseeable that allowing exhausted young men to drink before they had to drive home would create a risk of harm to those on the roads the men had to travel.

The argument, however, is not persuasive. First, there is no evidence that Hammers and Ditterline "had to drive home." Hammers and Ditterline were part of a crew assigned to work twelve-hour on/off shifts at a rig site for a one-week period. Although not required to, both Hammers and Ditterline were staying at the company provided mancamp. The mancamp served as the employees' place of residence during their stint at the rig and included sleeping quarters and provisions of food. After completing the shift on April 15, 2001, the crew retired to the mancamp to eat and rest before their next shift began in twelve hours. While Hammers and Ditterline proceeded to consume alcohol upon arrival at the mancamp, there was no "risk of harm to those on the roads the men had to travel" because there were no roads they *had* to travel, the expectation being that the crew would use the facilities at the mancamp to rest up for the next shift. Indeed, with the exception of Hammers and Ditterline, the crew members proceeded to go to bed after consuming alcohol and eating a meal. The record shows that Hammers and Ditterline made a spur-of-the-moment decision to drive away from the mancamp. Hammers and Ditterline were under no compulsion to remain at the camp and could do whatever they wanted until their next shift began. They informed no one at the camp of their decision. There is no evidence in the record that any other employee of Caza knew or even should have known that Hammers and Ditterline were or were not going to be driving anywhere. There was no evidence that Caza or its agents allowed "exhausted young men to drink before they had to drive home."

[¶ 22] Under the principles enunciated above, the injuries to the decedent were not a foreseeable consequence of Caza's actions. Presuming that Caza was negligent for allowing Hammers and Ditterline to consume alcohol on company premises, the accident and the consequent injury suffered by the decedent was not the "natural and probable consequence of [that] act of negligence" nor a "substantial factor in bringing about" the injury. The decedent's injury was the natural and probable consequence of the voluntary decision by Hammers and Ditterline to operate a motor vehicle while intoxicated on their own time off company premises. At most, Caza's conduct created "only a condition or occasion for the harm to occur" and was only a remote, not a proximate or foreseeable, cause.

[¶ 23] *The closeness of the connection between the defendant's conduct and the injury suffered.* As noted above, Caza's actions were remote from the injury suffered.

[¶ 24] *Degree of certainty that the plaintiff suffered injury.* There is no dispute that the decedent suffered injury.

[¶ 25] *The moral blame attached to the defendant's conduct.* "Serious misconduct may increase the scope of persons who are entitled to protection afforded by the imposition of duty." *Erpelding v. Lisek,* 2003 WY 80, ¶ 25, 71 P.3d 754, 759 (Wyo.2003).

This factor is used to determine whether the defendant is morally culpable before imposing liability. Moral blame generally results from situations in which the defendant had direct control over establishing and ensuring proper procedures to avoid the harm caused or where the defendant is the party best in the position to prevent the injury.

*Larsen v. Banner Health System,* 2003 WY 167, ¶ 30, 81 P.3d 196, 205 (Wyo.2003).

[¶ 26] Whatever the degree of moral blame for the accident, the lion's share must rest on Hammers, who elected to operate a motor vehicle while intoxicated, and Ditterline, who allowed Hammers to drive his vehicle. Indisputably, Caza violated its own safety policy when its agents allowed Hammers and Ditterline to consume alcohol on compa-

ny premises. That activity, however, was not illegal. When they left the mancamp, Hammers and Ditterline were on their own time in a private vehicle. They did not inform anyone of their plans, and there is no evidence that anyone at Caza was aware that they were going to be driving. The degree of moral culpability that can be attached to Caza's conduct, if any, is slight.

[¶ 27] *The policy of preventing future harm; the extent of the burden on the defendant; and the consequences to the community and the court system.* We will consider these three factors together, which at their essence are simply an examination of the policy reasons for and against adoption of a duty.

[¶ 28] The law generally recognizes only two situations in which an employer is held liable for the negligent acts of his employees: when the employee is acting within the scope of his employment pursuant to the doctrine of respondeat superior, *Eklund v. PRI Environmental, Inc.*, 2001 WY 55, ¶ 12, 25 P.3d 511, 515 (Wyo.2001), and when the employee is acting outside the scope of his employment but is on the employer's premises or is using the chattel of the employer and the employer knows or has reason to know that it has the ability and opportunity to control the employee pursuant to Restatement (Second) of Torts § 317.[5] Appellants seek to expand an employer's liability for the negligence of their employees to encompass situations in which an employee is acting outside the scope of employment and the coverage of Restatement § 317 if the employee has violated a safety policy adopted by the employer with the stated purpose of protecting the general public. Appellants assert that imposing a duty would require employers to enforce the policies that they implement and that the public would benefit through increased safety. Appellants contend that no additional burden would be placed on the employer to require "reasonable" enforcement of its safety policies or on the court system as a consequence.

[¶ 29] We, however, think it more likely that an imposition of a duty under these circumstances would merely result in an employer forgoing adoption of any safety rules to avoid the risk of liability. *Premo*, 533 N.W.2d at 333. If it were even possible, let alone practicable, for an employer to monitor and control the conduct of their employees when they are off duty and off premises, the costs incurred to do so would be significant. An employer would be exposed to liability from an undefined, limitless class of potential plaintiffs. The community would suffer because employers would either abandon efforts to create a safer workplace to avoid liability or they would have to absorb the costs to protect themselves by cutting other expenses. Imposition of a duty in these circumstances would have significant effects on litigation as plaintiffs seek a "deep pockets" defendant. The dockets of the trial courts would face an increase in the amount and complexity of negligence cases. Any safety benefits derived from enforcing the policy would be lost if the risk of liability is greater than the cost of enforcement and employers simply rescind or refuse to implement safety policies. The burden on the employer does not arise from requiring it to enforce its safety policies but from requiring it do so for the benefit of a limitless class of potential plaintiffs. Compared to the negative consequences of imposing a duty under these circumstances, the benefits of doing so are slight.

[¶ 30] *The availability, cost and prevalence of insurance for the risk involved.* There is no evidence in the record regarding the availability or cost of insurance but expanding the scope of an employer's liability for the negligence of their employees can reasonably be presumed to increase the cost of insurance, if available, to employers.

[¶ 31] Under the circumstances of this case, the *Gates* factors do not favor imposing a duty on the defendant. We decline to expand the scope of an employer's liability for the negligent acts of their employees

5. We have not adopted § 317 of the Restatement (Second) of Torts. Since, as we will note later in this opinion, that section is not applicable to the factual situation before us, we do not do so in this case. We simply note that imposition of employer liability for employee negligence has been recognized under the section.

988

beyond that already established under the law.

[¶ 32] Appellants also urge imposition of a duty under § 317 of the Restatement (Second) of Torts. As we have already noted, however, that section imposes a duty on an employer for the negligent acts of its employees when they are acting outside the scope of their employment only if the employee is on the employer's premises or using the chattel of the employee. Neither situation is applicable to the facts of this case, so there was no duty owed under the section.

[¶ 33] Finally, Appellants argue that a duty was created by the contract Caza had with its employees Long, Hammers, and Ditterline. Appellants' third party beneficiary theory is not supported by a cogent analysis with citation to appropriate legal authority. We decline to consider it. *Cathcart v. Meyer,* 2004 WY 49, ¶ 20, 88 P.3d 1050, 1060 (Wyo.2004).

### CONCLUSION

[¶ 34] There was no duty owed under the circumstances by the defendant employer to the plaintiff's decedent. The district court's order granting the defendant summary judgment is affirmed.

GOLDEN, J., specially concurring.

[¶ 35] I write separately simply to clarify that this Court has taken into account the appellants' second issue regarding whether the Dram Shop Act is applicable to the facts of the instant case. The appellants' argument on this issue comes in two parts. First, the Dram Shop Act was raised below by the appellees as a defense, and the appellants attempt to rebut this possible defense. Because this Court finds no duty, there is no need for a defense, making this part of the appellants' argument moot. Second, the appellants attempt to argue that the Dram Shop Act creates a statutory duty. This argument, however, was never raised below. This Court will not address issues raised for the first time on appeal. Since the arguments presented by the appellants regarding the Dram Shop Act lead nowhere, there was

no need to address the issue in the majority opinion.